**IN THE UNITED STATES DISTRICT COURT,**

**DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| Saba Shahamat | : | |
| | : | |
|   Plaintiff, | : | |
| | : | |
|   Vs. | : | Docket No. 2:22-cv-7501 |
| | : | |
| Monmouth University, Scott Richards, and Stephanie | : | JURY TRIAL DEMANDED |
| Lynch, in their individual capacities, | : | CIVIL ACTION-LAW |
|   Defendants. | : | |

---

## **VERIFIED COMPLAINT**

Plaintiff by and through their undersigned attorneys, brings this Complaint against the above-named Defendants, agents, and successors in office, to safeguard her rights under the United States Constitution, State, and Federal law, and in support thereof alleges the following:

## **PRELIMINARY STATEMENT**

1. Plaintiff Saba Shahamat is a female student with disabilities, who recently attended Monmouth University (the "University") in its physician assistant ("PA") graduate student program.

2. Starting in September 2020, Ms. Shahamat enrolled in the University as a graduate student in the Physician Assistant Program.

3. Ms. Shahamat is diagnosed, *inter alia*, with attention deficit hyperactivity disorder ("ADHD") and generalized anxiety disorder. While attending the University, she had a 504 accommodation plan. The 504 plan, in no way, materially impairs the functioning of

the graduate program or materially alters the primary goals and objectives of the Program. In fact, the University helped Ms. Shahamat develop this plan to enable her to meet the program requirements.

4.  Prior to enrolling, as part of her decision-making process, Ms. Shahamat met with the Disability Services for Students Office, as well as the Program Director of the Master of Science Physician Assistant Program (*hereinafter* the "MSPA"), Dr. Scott Richards.

5.  Ms. Shahamat disclosed her concerns about her disability. The University gave Ms. Shahamat assurances that it would accommodate her disability.

6.  Ms. Shahamat collaborated with the Disability Services for Students Office in August of 2020 to develop her accommodations, which, for example, included:

    a.  No more than one test on a single day; and

    b.  One-and-a-half time more time allotted for test-taking and assessments.

7.  Upon information and belief, defendant Dr. Scott Richards held a supervisory role at the University, which included being the Program Director and Course Director at the time of the events giving rise to the instant litigation. Upon information and belief, he has since resigned from his position at the University due to the circumstances giving rise to the instant litigation.

8.  Upon information and belief, Defendant Stephanie Lynch held a supervisory role at the University, which included being the Clincal Director at the time of the events giving rise to the instant litigation.

2

**JURISDICTION AND VENUE**

9.  This court has jurisdiction under 28 U.S.C. §1331, as the causes of action contained

    herein invoke federal question jurisdiction, as Plaintiff brings claims arising under federal

    law.

10. Upon information and the belief, the defendant University is a federal funds recipient.

11. This court has supplemental jurisdiction over Ms. Shahamat's state claims pursuant to 28

    U.S.C. § 1367.

12. Venue for this action properly lies in this Judicial District pursuant to 28 U.S.C. §1391(b)

    because the events that give rise to the claims in this action occurred in this District.

**PARTIES**

**Plaintiff:**

13. Plaintiff Ms. Saba Shahamat is an adult individual with a legal address at 27 Indian Field

    Court, Mahwah, NJ 07430.

**Defendants:**

14. Defendant Monmouth University is a public university believed to be doing business at

    400 Cedar Avenue, West Long Branch, New Jersey, 07764.

15. Defendant Dr. Scott Richards is an adult individual who is believed to have done business

    at 400 Cedar Avenue, West Long Branch, New Jersey, 07764.

16. Defendant Stephanie Lynch is an adult individual who is believed to be doing business at

    400 Cedar Avenue, West Long Branch, New Jersey, 07764.

3

## FACTUAL ALLEGATIONS

## AS TO THE DISABILITY-BASED DISCRIMINATION

17. In January 2021, Ms. Shahamat started her second semester of the PA program. During this semester, the University discriminated against Ms. Shahamat based on her disability.

18. Contrary to the agreed upon  504 plan, the University denied Ms. Shahamat reasonable accommodations. More specifically, the University denied Ms. Shahamat extended time on  assessments; denied the excusal of absences, which was necessitated by her disabilities; denied her extended time on SOAP notes; refused to provide private, quiet testing rooms; and forced her to take back-to-back examinations (her 504 plan required spacing between examinations).

    a.  During the spring 2022 semester, the University refused to give extended time on SOAP notes, in violation of the 504 plan.

    b.  The University refused to provide Ms. Shahamat with a private, quiet testing room.

    c.  During the entire time that Ms. Shahamat was in the program, the University refused to provide spacing between examinations. The 504 plan required that she not take back-to-back examinations.

19. In the Spring 2021, to address the refusal to accommodate her disability, Ms. Shahamat hired a lawyer and disability advocate. On Ms. Shahamat's behalf, the advocate reported to the University that it was discriminating against her based on her disability. The University, however, was deliberately indifferent and, as set forth below, continued to intentionally discriminate against her.

4

20. Around this time, Ms. Shahamat's mother sent Dean Mauro a letter detailing the University's failure to provide adequate accommodations.[1] Dean Mauro agreed that the University had neglected to provide reasonable accommodations, apologized, and made assurances that the discrimination would end. Dean Mauro also stated that she would ask the professors to reverse their unsupported findings of the alleged unprofessionalism.[2] Dean Mauro specifically directed the professors and Dr. Richards to reverse the findings because the University was "violating the Americans with Disabilities Act." For these reasons, the University agreed to accommodate with Ms. Shahamat.

21. At the end of the spring semester 2021, Dean Mauro verbally  promised to accommodate Ms. Shahamat's disabilities. This included Dr. Richards telling Ms. Shahamat that he was placing her on a remediation plan, even though the University cleared her of  the finding that she engaged in unprofessional conduct. In addition, he made unfounded allegations that she had plagiarized and that she was a behavioral problem.

22. Upon information and belief, Dr. Richards was offended that Ms. Shahamat's mother *went above his head* and got Dean Mauro and the provost to reverse the finding that she had engaged in unprofessional conduct.

23. Starting in the fall 2021, Dr. Richards responded to the letter and advocacy by taking steps to do whatever he could to force Ms. Shahamat to leave the program. This included Dr. Richards insisting that Ms. Shahamat participate in a remediation program over the summer to address her "behavioral issues," even though the University reversed the

---

[1] Ms. Shahamat's aunt, who is a neuropsychologist wrote the letter. However, Ms. Shahamat's mother sent the letter on her  behalf.
[2] In April 2021, Dr. Richards accused Ms. Shahamat of engaging in unprofessionalism. As above indicated, Ms. Shahamat's 504 plan affirms that she did not take back-to-back examinations. The University refused to follow the 504 plan and forced her to take examinations back-to-back, which caused her to miss class. Upon information and belief, Dr. Richards was aware of this accommodation, but, nonetheless, falsely asserted that Ms. Shahamat engaged in unprofessional conduct.

finding of unprofessionalism. As below indicated, the retaliation would continue into the fall semester and would increasingly worsen.

24. Around the first week of the semester, Dr. Richards met with Ms. Shahamat to inform her that he and others at the University had revised the student Handbook. He specifically informed her that they revised the Handbook in response to the letter Ms. Shahamat's mother had sent. The amendment to the Handbook states there no longer needs to be a warning before giving a negative Professional Development Assessment Tool ("PDAT") score, which would have affected her final grade. This amendment was specifically directed at Ms. Shahamat.

25. By the start of the Fall 2021 semester, Dr. Richards resumed harassing Ms. Shahamat. Despite Dean Mauro's directive, Dr. Richards continued to allege, without any evidence, that Ms. Shahamat's behavior was an issue.

26. Dr. Richards publicly reprimanded Ms. Shahamat for nonexistent infractions. For example, when Ms. Shahamat attempted to plug her laptop in during class, he disciplined her in front of the entire class, claiming that she was causing a disruption. Similarly, he yelled at Ms. Shahamat to close her laptop, which she was using to take notes during class.

27. Whenever Dr. Richards would speak with Ms. Shahamat in class, he would speak to her condescendingly.

28. Because Dr. Richards would frequently speak with contempt at Ms. Shahamat in class, her classmates avoided her. In fact, he has even yelled at her in front of the class. In response to Dr. Richards, the students mocked Ms. Shahamat on a public group chat, which further embarrassed her and caused her emotional distress.

29. In response to the negative treatment, Ms. Shahamat's anxiety reached such a heightened level, that she began to seek medical treatment during Summer of 2021 and Fall 2021 semesters. In fact, the Defendants caused her emotional distress to become so severe, Ms. Shahamat began to experience uterine hemorrhaging. She additionally began to experience breathing difficulties. Ms. Shahamat also reports that she has trouble sleeping, which she attributed to Dr. Richard's conduct.

30. Upon information and belief, Dr. Richards was targeting Ms. Shahamat for the presentation of her disabilities. For example, Ms. Shahamat often presents anxiety and nervous behavior.  Here, Ms. Shahamat believes that Dr. Richards was specifically targeting her based on the presentation of her anxiety.

31. Notably, Dr. Richards and other staff members told Ms. Shahamat she was "causing problems" by having a disabilities advocate assisting her. Following the disabilities advocate requesting that the University stop harassing Ms. Shahamat on the basis of her disabilities and to offer her reasonable accommodations, Dr. Richards increased the intensity of the disability-based harassment.

32. Ms. Shahamat understood Dr. Richard's and University's response to her disability advocate to be a threat. Furthermore, she understood their response to be focused on removing her from the program.

33. During the fall semester 2021, Dr. Richards refused to put in three quiz grades that Ms. Shahamat had completed.

34. In January 2022, Professor Papapietro informed Ms. Shahamat that she would not be providing her with extended time to write the in-class SOAP[3] note, even though Ms. Shahamat's 504 plan required this accommodation.

35. In February 2022, the University scrutinized Ms. Shahamat's work and found two sentences, which it alleged that she plagiarized and engaged in professional misconduct. Ms. Shahamat maintains that she did not plagiarize, nor did she intend to plagiarize.[4] If anything, Ms. Shahamat committed a minor error while writing.

36. The University jumped on this error and used it as its pretextual basis to remove Ms. Shahamat from the program.

37. In February 2022, Professors Papapietro and Lynch asked Ms. Shahamat to attend a meeting with them. Based on their representations, the meeting was to help Ms. Shahamat address her writing challenges. Contrary to these representations, the meeting consisted of an ambush in which the professors browbeat and made fun of Ms. Shahamat. While the professors convened the meeting under the pretext about alleged plagiarism, the professors spent most of the meeting making fun of her. In response to the professors making fun of her, Ms. Shahamat had a panic attack during this meeting. This resulted in Ms. Shahamat struggling to speak and to answer simple questions. Professor Lynch laughed at Ms. Shahamat and mocked her when she had her panic attack.

38. Following the meeting, Professor Papapietro retroactively gave Ms. Shahamat a zero on two of her SOAP notes.

---

[3] SOAP stands for Subjective, Objective, Assessment, and Plan. These are the patient summary notes that the students write as part of their class assignments.

[4] "The University defines plagiarism as A.) Submitting written materials without proper acknowledgement of the source; B.) Deliberate attribution to, or citation of, a source from which the reference material was not in fact obtained; C.) Submitting data which have been altered or contrived in such a way as to be deliberately misleading. Aiding or abetting another individual to plagiarize." Monmouth University Faculty Desk Reference at 79. (This book functions as the student handbook. *Id.* at 1). Central to the University's definition is the mental state deliberate.

39. Because of the bullying encountered during this meeting--an apparent setup to ridicule her--Ms. Shahamat is treating with professionals.

40. Aside from the harassment and mockery, the main takeaway from the meeting was that the University was basesly accusing Ms. Shahamat of plagiarism and professional misconduct.[5]

41. During this same meeting, the professors candidly informed Ms. Shahamat that they were forgoing procedural due process and would be summarily accelerating her removal. They noted that they would also give her an F for the course. The very next day, without providing any process, the professors gave Ms. Shahamat an F in the course.

42. In order to remove a student with disabilities from a program due to patient safety, 42 USC §12,111(3) of the Americans with Disabilities Act ("ADA") required that the University conduct a direct threat analysis. The University has not engaged in this process prior to removing her from the program; but has instead contended that alleged plagiarism constitutes the requisite threat to patient safety.

43. On March 18, 2022, Ms. Shahamat timely appealed the allegations. Rather than having a hearing before expelling Ms. Shahamat, the University had Ms. Shahamat participate in what amounted to a performance improvement plan, which would require her to admit to engaging in conduct which could justify her termination from the program.

44. More specifically, in June 2022, the University asked Ms. Shahamat to write an essay, wherein she confessed to their allegations and how she would not engage in this conduct again, together with how she was going to improve. The main thrust of the essay was to basically present the University with a signed confession without any due process or any

---

[5] It is curious that the University is taking steps to expel Ms. Shahamat for plagiarism, when other students have cheated and the University did not expel them. Upon information and belief, these other students did not have disabilities.

sense of how they would decide her fate. Here, it should be noted that the University gave Ms. Shahamat no choice, as it mandated that she must admit to plagiarism, even though she denies this allegation.

45. Ms. Shahamat did not admit to plagiarism in her essay, as she maintains that she never committed this offense. However, she did submit an essay speaking to her growth as a student.

46. Ms. Shahamat requested a hearing, which the Handbook requires. The University, however, refuses to provide her with a hearing.

47. On November 1, 2022, the University confirmed that it was denying her appeal.

48. On November 4, 2022, the University informed Ms. Shahamat that it was denying her appeal and that it was expelling her from the program.

49. On November 4, 2022, Ms. Shahamat requested that the University's Graduate Academic Standards and Review Committee (the "GASRC") overturned the University's expulsion.

50. On November 21, the GASRC denied overturning her expulsion. The GASRC affirmed that the expulsion was "final and binding."

## **AS TO THE UNIVERSITY'S ONGOING BREACH OF CONTRACT**

51. At the start of the Spring 2022 semester, the University essentially conducted an experiment on the students. This new curriculum fell outside the scope of any enrollment contract and the curriculum expectations for which the students had bargained at the beginning of the semester.

52. Rather than adhering to the tried and true teaching methodology that the University guaranteed, it decided to treat the students as *guinea pigs*.

53. The new, clinical immersion program forgoes the traditional curriculum, which includes starting with the didactic instruction, progressing to the white coat ceremony, and then to the clinical component. The traditional curriculum had the students learn the basics in the classroom before advancing to the clinical setting. The clinical immersion approach, on the other hand, hybridized the classroom and clinical instruction.

54. While a novel approach, this is not what Ms.Shahamat bargained for when she enrolled in the program. In other words, the University, without consideration, altered the contract it formed with Ms. Shahamat.

55. Additionally, on January 18, 2022,  professor Pauline Papapietro refused to provide the students with a syllabus for the Clinical Management course. The Student Handbook, however, said that the syllabus should be in place by the end of the first week of the semester. On February 11, 2022, which was several weeks into the semester, Dr. Papapietro finally provided the students with the syllabus. During the time passed between January 8 and February 11, Dr. Papapietro vacillated between whether the class should be graded as pass-fail or for a grade; the number of assessments to be completed by the students and how these assessments were to be administered. Additionally, she failed to provide any course objectives and expectations to the students.

56. This civil complaint followed.

### Count 1
### DISCRIMINATION UNDER THE AMERICANS WITH DISABILITIES ACT--DENIED THE BENEFITS OF EDUCATIONAL SERVICES BY REASON OF DISABILITY
*Ms. Shahamat v. Monmouth University*

57. Ms. Shahamat  hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

58. The Americans with Disabilities Act ("ADA") prohibits discrimination against qualified individuals with disabilities on the basis of their disability. 42 U.S.C. §§ 12161, 12132. To establish a claim under the ADA, a plaintiff must demonstrate that: (1) she has a disability, or was regarded as having a disability; (2) she was "otherwise qualified" to participate in school activities; and (3) she was "denied the benefits of the program or was otherwise subject to discrimination because of her disability." *A.G. v. Lower Merion Sch. Dist.*, 542 F. App'x 193, 198 (3d Cir. 2013).

59. The Defendant University discriminated against, and denied Plaintiff the benefits to her program, under the Americans with Disabilities Act when:

    a.  The Plaintiff is recognized as a person with disabilities, which includes attention deficit hyperactivity disorder ("ADHD") and generalized anxiety disorder.

    b.  The University is believed to be a federal funds recipient for purposes of the ADA.

    c.  The Plaintiff  is otherwise qualified to participate in the PA program, as evidenced by the University granting her admission with full knowledge of her disabilities and required accommodations.

12

    d.   Plaintiff was denied the benefits of the PA program in several ways--through the denial of agreed-upon accommodations as detailed above, and the creation of an environment that exacerbated her stress and retaliatory actions when she asserted rights under the ADA.

    e.   Furthermore, the University has denied Plaintiff the benefits of her program and has subjected her to disability based discrimination, which included, *inter alia*, refusing to provide and implement her accommodations, which were developed through her 504 plan.

    f.   Ms. Shahamat required these accommodations to meaningfully access and to participate in her education. As a direct and proximate result of the University refusing to put these accommodations in place, she was unable to access her course materials and education equal to that of her non-disabled peers.

    g.   The University's deliberate indifference to implementing her accommodations, together with their intentional discrimination, interfered with Ms. Shahamat's ability to fully participate and benefit from her PA program.

60. As a direct and proximate result of Defendants' deliberate indifference and intentional discrimination, the Defendants denied Ms. Shahamat the benefits of her program.

61. Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth in the prayer for relief.

<u>**Count 2**</u>
**AMERICANS WITH DISABILITIES ACT--FAILURE TO COMPLY WITH THE
ACT'S DIRECT THREAT ANALYSIS**
*Ms. Shahamat v. Monmouth University*

62. Ms. Shahamat hereby realleges all matters set forth in the preceding paragraphs of this

complaint and incorporates them herein.

63. The ADA defines a direct threat as a "significant risk to health or safety of others that

cannot be eliminated by reasonable accommodation." 42 USC §12,111(3). The ADA

regulations require that in determining whether a direct threat exits, the covered entity

must conduct an individualized assessment, based on reasonable judgment that relies on

current medical knowledge or on the best available objective evidence to ascertain the

nature, duration, and severity of the alleged risk; the potential injury that **will actually**

**occur;** and whether reasonable modifications of policies, practices, or procedures, or

provision of auxiliary aids or services will mitigate the risk. *See* 28 CFR §36.208(c)[6].

64. Central to the ADA and above-cited regulations is whether or not the student **actually**

**provides** a direct threat.

65. As a threshold matter, Ms. Shahamat, in no way, provides any direct threat to patient

safety, whatsoever. The University's allegation is that a few sentences were plagiarized on

---

[6] Notably, the direct threat analysis is similar to Title I of the ADA and EEOC regulations, which  contemplates a determination of whether or not the employee is able to perform essential functions of the employment without posing a direct threat to themselves or to others. 29 CFR §1630.2(r).

a writing assignment. Contrary to the University's allegations, it is a huge, logical leap to argue that a student plagiarizing a sentence or two on a writing assignment constitutes a threat to patient safety.

66. At no point has the University provided any evidence, nor has it argued that Ms. Shahamat did something to actually jeopardize patient safety. They never asserted that she actually harmed a patient; they have not averred that she engaged in reckless conduct while in a clinical setting; and they have not shown that she has neglected any of her patients. Their claims, rather, center solely on an allegation that she made an error while completing a minor writing assignment.

67. Despite the University's strong contention that Ms. Shahamat is "a threat to patient safety," they neglected to complete a threat assessment, as required by the clear language of the ADA.

68. That the University has failed to conduct any direct threat analysis shows, beyond all doubt, that they are deliberately indifferent and that they are intentionally discriminating against Ms. Shahamat on the basis of her disability.

69. The University's clear refusal to conduct the threat assessment shows that any allegation for excluding Ms. Shahamat from the program on the basis of plagiarism is pretext and, really, just a fig leaf for their bald-face discrimination.

70. The University's refusal in and deliberate indifference to completing the threat

assessment, together with their intentional discrimination against Ms. Shahamat, is the

direct and proximate cause of her harm.

71. Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth in

the prayer for relief.

<u>**Count 3**</u>
**DISCRIMINATION UNDER § 504 OF THE REHABILITATION ACT**
*Ms. Shahamat v. Monmouth University*

72. Ms. Shahamat  hereby realleges all matters set forth in the preceding paragraphs of this

complaint and incorporates them herein.

73.  To establish a prima facie case under the §504 of the Rehabilitation Act ("RA")[7], a party

must show: (a) they were a person with a disability; (b) they were otherwise qualified for

participation in the program; (c.); the program they are challenging receives federal

financial assistance; and (d.) they were subject to discrimination solely on the basis of

their disability. *Hornstine v. Township of Moorestown,* 263 F. Supp. 2d 887, 905 (D.N.J

2003).

74. The Defendant University discriminated against, and denied Plaintiff, the benefits to her

program, under the RA when:

    a.   Plaintiff is a person with disabilities recognized by the statute and acknowledged

        by the Defendant. Specifically, as detailed above, she is a person with attention

        deficit hyperactivity disorder ("ADHD") and generalized anxiety disorder.

---

[7] *See* 29 U.S.C. § 794(a).

b.  The Plaintiff was qualified for the PA program offered by Defendant-University as evidenced by the Defendant's admission of her into the program with full knowledge of the nature of her disabilities and the required accommodations.

c.  Upon information and belief, the PA program at Defendant University receives federal funding.

d.  The Plaintiff, as detailed above, was subject to discriminatory actions because of her disability, which included refusing to provide her with accommodations.

e.  Ms. Shahamat required these accommodations to meaningfully access and to participate in her education. As a direct and proximate result of the University refusing to put these accommodations in place, she was unable to access her course materials and education equal to that of her non-disabled peers.

f.  The University's deliberate indifference to implementing her disabilities, together with their intentional discrimination, interfered with Ms. Shahamat's ability to fully participate and benefit from her PA program.

75. As a direct and proximate result of Defendants' deliberate indifference and intentional discrimination, the Defendants denied Ms. Shahamat the benefits of her program.

76. Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT 4
## RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT
### *Ms. Shahamat v. Monmouth University*

17

77. Ms. Shahamat  hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

78. The Americans with Disabilities Act protects individuals from retaliation for engaging in activities, seeking to press or vindicate rights provided by statute. §12203 of the ADA provides:

> No person shall discriminate against any individual because such individual ***has opposed any act*** or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

42 U.S.C. §12203(a).

79. Ms. Shahamat engaged in a protected and lawful activity when she engaged and employed the services of disabilities advocate and when her mother sent the letter on her behalf, to secure accommodations.

80. During the fall semester 2021, Dr. Richards and other staff verbally instructed Ms. Shahamat that she was "causing problems" by engaging the advocate. Ms.  Shahamat reports that she felt intimidated after they made these threatening remarks to her. Additionally, following the advocacy and the letter, Dr. Richards and other staff waged a campaign of disability-based harassment, which included staff alleging the fictitious plagiarism charges against her.

81. Following the advocacy, whenever Dr. Richards would speak with Ms. Shahamat in class, he would speak to her condescendingly. Because Dr. Richards and faculty would frequently verbally degrade Ms. Shahamat in class, her classmates avoided her and even

18

mirrored the faculty's attitude toward her. This included students mocking her on a public group chat, which further embarrassed her.

82. Additionally, during the fall semester 2021, which, again, was after Ms. Shahamat engaged the advocate, Dr. Richards refused to put in three quiz grades. Ms. Shahamat completed these quizzes, but Dr. Richards refused to give her credit for the work. As a result, she received three zeros.

83. In February 2022, the University began *flyspecking* Ms. Shahamat's work, which, upon information and belief, was a search for any pretextual basis to remove her from the program. Here, the University jumped onto an alleged writing error and moved to expel her.

84. Ms.  Shahamat reports that these threatening remarks regarding the disabilities advocate, together with the harassment, chilled her ability to engage in an interactive and collaborative process with the University to develop reasonable accommodations. The retaliatory conduct further denied her access to her program.

85. Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## COUNT 5
## RETALIATION UNDER § 504 OF THE Rehabilitation Act
*Ms. Shahamat v. Monmouth University*

86. Ms. Shahamat  hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

87. The federal regulations under §504 provide:

No recipient [of federal funds] or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by the [Rehabilitation Act], or because he has made a complaint, testified, assisted, or participated in any manner, proceeding or hearing [.]

34 CFR §107(e).

88. Ms. Shahamat engaged in a protected and lawful activity when she engaged and employed the services of disabilities advocate and when her mother sent the letter on her behalf, to secure accommodations.

89. During the spring semester 2021, Dr. Richards and other staff verbally instructed Ms. Shahamat that she was "causing problems" by engaging the advocate. Ms. Shahamat reports that she felt intimidated after they made these threatening remarks to her. Additionally, following the advocacy and the letter, staff waged a campaign of disability-based harassment, which included staff alleging the fictitious plagiarism charges against her.

90. Following the advocacy, whenever Dr. Richards would speak with Ms. Shahamat in class, he would speak to her condescendingly. Because Dr. Richards and faculty would frequently verbally degrade Ms. Shahamat in class, her classmates avoided her and even mirrored the faculty's attitude toward her. This included students mocking her on a public group chat, which further embarrassed her.

91. Additionally, during the fall semester 2021, which, again, was after Ms. Shahamat engaged the advocate, Dr. Richards refused to put in three quiz grades. Ms. Shahamat

completed these quizzes, but Dr. Richards refused to give her credit for the work. As a

result, she received three zeros.

92. In February 2022, the University began *flyspecking* Ms. Shahamat's work, which, upon

information and belief, was a search for any pretextual basis to remove her from the

program. Here, the University jumped onto an alleged writing error and moved to expel

her.

93. Ms. Shahamat reports that these threatening remarks regarding the disabilities advocate,

together with the harassment, chilled her ability to engage in an interactive and

collaborative process with the University to develop reasonable accommodations. The

retaliatory conduct further denied her access to her program.

94. Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth in

the prayer for relief.

## COUNT 6
## NEW JERSEY LAW AGAINST DISCRIMINATION
*Ms. Shahamat v. All Defendants*

95. Ms. Shahamat  hereby realleges all matters set forth in the preceding paragraphs of this

complaint and incorporates them herein.

96. The Defendants denied Plaintiffs the benefits to her program under the New Jersey Law

Against Discrimination ("NJLAD") when:

  a.  The NJLAD prohibits discrimination and harassment on the basis of disability

       status. N.J. Stat. Ann. § 10:1-2.

    b.   NJLAD applies to colleges and universities in the State of New Jersey.

    c.   Plaintiff is entitled to attend school at the University.

    d.   The University abridged Ms. Shahamat's rights under NJLAD when it discriminated against Ms. Shahamat because of her disability as above detailed.

97. Dr. Richards abridged Ms. Shahamat's rights under NJLAD when he aided and abetted the discrimination against her. More specifically:

    a.   At the time of the harm giving rise to the instant matter, Dr. Richards was a supervisor at the University, working in the capacity of a program director.

    b.   Dr. Richards aided and abetted the discrimination when he retaliated against Ms. Shahamat for obtaining the advocate; when he retaliated against Ms. Shahamat for her mother sending a letter to Dean Mauro; when he engaged in ongoing, disability-based harassment; when he took steps to remove Ms. Shahamat from her program based on her disabilities; and when he refused to work with her to develop and implement reasonable accommodations.

    c.   Upon information and belief, Dr. Richards was generally aware of his overall role in illegal activity at the time he aided and abetted the University.[8]

    d.   Upon information and belief, Dr. Richards knowingly and substantially assisted the University in its discriminatory treatment, which included purposeful disability-based harassment and retaliation.

---

[8] At the time, Ms. Shahmat's advocate put him on notice that his conduct was discriminatory and illegal.

e.   Upon information and belief, Dr. Richards was one of the main actors, orchestrating the discriminatory conduct, in concert with the University.

f.   Dr. Richards was present for most, if not all, of the time of the discriminatory and retaliatory conduct, up until December 2021.

g.   Throughout the time of the discriminatory and retaliatory conduct, Dr. Richards was at many of the meetings and, upon information and belief, was frequently in communication with other staff members who were party to the aforementioned conduct.

h.   Upon information and belief, Dr. Richards acted intentionally, knowingly, and recklessly when he retaliated against Ms. Shahamat and furthered the University's discrimination against her.

98. Professor Lynch abridged Ms. Shahamat's rights under NJLAD when he aided and abetted the discrimination against her. More specifically:

a.   Professor Lynch maintains the supervisory position of clinical director.

b.   Professor Lynch aided and abetted the the discrimination when she participated  in the February 22 ambush meeting; when Professor Lynch made fun of Ms. Shahamat during that meeting when she had a panic attack; when Professor Lynch accused Ms. Shahamat of causing problems for engaging an advocate, to name a few examples.

    c.   Upon information and belief, Professor Lynch was frequently in communication with other staff members who were party to the aforementioned conduct.

    d.   Upon information and belief, Professor Lynch acted intentionally, knowingly, and recklessly when he retaliated against Ms. Shahamat and furthered the University's discrimination against her.

99. The conduct of all Defendants resulted in excluding Ms. Shahamat from the benefits of her program on the basis of her disability. This included the Defendants refusing to implement reasonable accommodations, conducting a direct threat assessment, retaliating against her, harassing her on the basis of her disability, and removing her from the program on the basis of her disability. Moreover, the Defendants created a hostile learning environment.

100.   As a direct and proximate result of Defendants' deliberate indifference and intentional discrimination, the Defendants denied Plaintiff the benefits of her program.

101.   Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth in the prayer for relief.

**<u>COUNT 7</u>**
**BREACH OF CONTRACT**
*Ms. Shahamat v. Monmouth University*

102.   Ms. Shahamat  hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

103.   Plaintiff and the Defendant had formed a binding Contract for the Plaintiff to attend the University.

104.    Plaintiff and the Defendant entered into a binding contract when:

    a.   The Plaintiff paid consideration for the Contract and when the Plaintiff specifically paid tuition in exchange for her education.

    b.   There was a valid offer and acceptance of this Contract between the parties.

    c.   Both parties accompanied this consideration with a signed writing, which bound the parties to the Contract.

105.    The Defendant University breached the Contract when it unilaterally changed the terms of the Handbook without consideration.

106.     The Defendant University breached the Contract when it failed to provide Ms. Shahamat with a hearing, which its policies required.

107.    The University breached the Contract when it expelled Ms. Shahamat from her program. Here, the University and Ms. Shahamat entered into a contract for the University to educate Ms. Shahamat in exchange for the tuition money she paid. Despite the fact that Ms. Shahamat paid the tuition, the University expelled her from the University without any legally justifiable basis.

108.    By breaching the Contract, the University has directly and proximately caused Plaintiff's damages, which include, but are not limited to, financial loss, interests on student loans, consequential damages, and related costs.

109.     Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth in the prayer for relief.

**COUNT 8**
**COMMON LAW DUE PROCESS/FUNDAMENTAL FAIRNESS**
*Ms. Shahamat v. Monmouth University*

110.    Ms. Shahamat  hereby realleges all matters set forth in the preceding paragraphs of

this complaint and incorporates them herein.

111.    "The touchstone of due process is protection of the individual against arbitrary action[.]"

*Wolff v. McDonnell,* 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974). When a private

institution, such as a private school, fulfills a public function, including student discipline, that

institution owes its students a common law duty of due process.

112.    The University fulfills a public function by undertaking the education of its students.

113.    The University has set forth a code of conduct and Student Handbook to which it expects

students to abide. The Handbook requires that the University provide students with hearing for

disciplinary removals, including academic misconduct.

114.    The University has failed to provide Ms. Shahamat with a hearing following its

allegation that she was responsible for plagiarism and professional misconduct.

115.    The University is instead expelling Ms. Shahamat without any due process,

whatsoever.

116.    Rather than providing Ms. Shahamat with a hearing, which their Handbook requires,

it is subjecting her to an arbitrary and capricious punishment, which, in this case,

involves an expulsion.

117.    Though the University has disciplinary procedures, it did not afford such a process to Ms.

Shahamat.

118.    On account of the University's deprivation of Ms. Shahamat's common law right to due

process and fundamental fairness, she has suffered injuries and damages, and the University's

conduct is the direct and proximate cause of Plaintiff's harms.

119.    Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth

in the prayer for relief.

### COUNT 9
### UNJUST ENRICHMENT
*Ms. Shahamat v. Monmouth University*

120.    Ms. Shahamat hereby realleges all matters set forth in the preceding paragraphs of

this complaint and incorporates them herein.

121.    Ms. Shahamat paid $131,599 in tuition since enrolling in the program, including

$13,346.00 at the beginning of the 10-week Spring I 2022 "Clinical Immersion"

Semester.

122.    However, when the Defendant University expelled Ms. Shahamat from the program

on November 4, 2022, it retained the money Plaintiff deposited/paid. In other words, the

Defendant University never refunded Plaintiff the money she paid.

123.    Plaintiff paid tuition to the University in exchange for the University to provide her

with an education. The University has since expelled her and never provided the

education for which the parties have bargained.

124.    The Defendant University has since retained this money.

125.    As a direct and proximate result of the defendants retaining the deposit, they are

being unjustly enriched at the Plaintiffs' detriment, which has only compounded their

damages and concomitant harm.

126.    Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth

in the prayer for relief.

**Count 10**
**SLANDER**
*Ms. Shahamat v. Dr. Richards and Professor. Lynch*

127.    Ms. Shahamat hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

128.    Both Defendants committed slander against Ms. Shahamat when he publicly uttered false statements about Ms. Shahamat. This included Dr. Richards telling staff that Ms. Shahamat engaged in unprofessionalsim; when Professor Lynch alleged that she was a threat to safety, and that she has a behavior problem.

129.    Additionally, this included Professor Lynch falsely accusing Ms. Shahamat of plagiarism, committing professional misconduct, and being a threat to patient safety and when she stated"we just don't want you to be killing patients".

130.    Both Defendants, Dr. Richards and Professor Lynch, acted intentionally, knowingly, and with a reckless disregard for the truth.

131.    Both Defendants, Dr. Richards and Professor Lynch, were aware of the falsity of their statements.

132.    Both Defendants, Dr. Richards and Professor Lynch, uttered these false statements to other staff members, which included Ms. Shahamat's other professors.

133.    Dr. Richards' and Professor Lynch's statements materially and substantially harmed Ms. Shahamat's reputation in the school community, which included other professors treating Ms. Shahamat differently and as if she was a threat; students and faculty ostracizing her; and students harassing her. Moreover, these false statements adversely impacted Ms. Shahamat's reputation and caused her to be viewed in a detrimental light.

134.    Their false statements are a direct and proximate cause of Ms. Shahamat's expulsion

from the University. In other words, by falsely reporting that Ms. Shahamat plagiarized,

committed professional misconduct, and that she was a threat to patients, the University

had a false basis to expel her from the program.

135.    Defendants' false statements have caused Ms. Shahamat both economic and

non-economic losses.

136.    Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth

in the prayer for relief.


**Count 11**
**FALSE LIGHT**
*Ms. Shahamat v. Dr. Richards and Professor Lynch*

137.    Ms. Shahamat hereby realleges all matters set forth in the preceding paragraphs of

this complaint and incorporates them herein.

138.    The Defendants, Dr. Richards and Professor Lynch, presented Ms. Shahamat in a

false light when they made false allegations against her and when Dr. Richards repeatedly

verbally abused Ms. Shahamat publically.

139.    The Defendants acted intentionally, knowingly, negligently, and with a reckless

disregard for the truth, presented Ms. Shahamat in a false light.

140.    By presenting Ms. Shahamat in a false light, her reputation as a poor student and

threat to patient safety has become widely known with both students and faculty. In fact,

prior to her expulsion, other students started to avoid Ms. Shahamat because of the way

Dr. Richards would yell at her during class and the way he would speak to her with

derision.

141.    As a result of Dr. Richards publicly yelling at Ms. Shahamat, she lost the ability to network with other students and to benefit from being part of their study groups. Dr. Richards' and other faculty's conduct served to isolate Ms. Shahmat from her peers.

142.    Professor Lynch's false representations served to make Ms. Shahamat appear to be a danger to other professors.

143.    By presenting Ms. Shahamat in a false light, both Defendants, Dr. Richards and Professor Lynch, have impaired Ms. Shahamat's reputation in the school community.

144.    Ms. Shahamat reports that she is suffering emotional distress as a result of being cast in a false light. She also reports that she now has diminished economic prospects, as she has less students with whom to network and she is now being kept out of the job market due to the expulsion, which, in part, stemmed from the Defendants presenting her in a false light.

145.    Defendants' conduct have caused Ms. Shahamat both economic and non-economic losses.

146.    Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth in the prayer for relief.

### COUNT 12
### EMOTIONAL DISTRESS
*Ms. Shahamat v. All Defendants*

147.    Ms. Shahamat  hereby realleges all matters set forth in the preceding paragraphs of this complaint and incorporates them herein.

148.    The University, Dr. Richards, and Professor Lynch committed the tort of intentional infliction of emotional distress:

a.  The Defendants acted intentionally and recklessly.

b.  The Defendants' conduct was extreme and outrageous, exceeding the bounds of decency and, thus, utterly intolerable in civilized society.

c.  The Defendants, including Dr. Richards and Professor Lynch, subjected Ms. Shahamat to ongoing disability-based harassment and retaliation. This included Dr. Richard's publicly embarrassing Ms. Shahamat when he yelled at her in front of the entire class; when staff would ambush Ms. Shahamat with a surprise meeting to falsely accuse her of unprofessionalism; where staff, upon information and belief, would intentionally concoct stories that Ms. Shahamat plagiarized and had engaged in unprofessionalism; when Dr. Richards and other staff harassed her for her disabilities; when Dr. Richards and staff retaliated against her.

d.  The emotional distress Plaintiff suffered is so severe that no reasonable person could be expected to endure such distress.

e.  Ms. Shahamat is now experiencing and has experienced physical symptoms, including loss of sleep, panic attacks, and uterine bleeding, as a direct and proximate result of the Defendants' conduct.

f.  Ms. Shahamat has sought medical treatment and counseling to address the symptoms she has endured.

g.  Ms. Shahamat has suffered damages as a result of the emotional distress.

149.   Wherefore, Ms. Shahamat prays for relief against Defendants as hereinafter set forth in the prayer for relief.

## DAMAGES

150.   Plaintiff suffered general, special, incidental, and consequential damages as the direct and proximate result of the acts and omissions of all Defendants, in an amount that shall be proven at the time of trial. These damages include, but are not limited to: damages for general pain and suffering; damages for the loss of enjoyment of life, both past and future; medical and medical-related expenses, both past and future; travel and travel-related expenses, both past and future; emotional distress, both past and future; pharmaceutical expenses, both past and future; loss of income and employment opportunities; and any and all other ordinary, incidental, or consequential damages that would or could be reasonably anticipated to arise under the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Ms. Shahamat respectfully prays that the court award her compensatory and restitutionary damages against Defendants Monmouth University, Dr. Richards, and Professor Lynch for, including, but not limited to, psychological treatment, lost wages, loss of future earnings, loss of enjoyment of life, emotional pain and suffering, interference with her civil rights, and reasonable attorneys' fees and costs of suit. Furthermore, Ms. Shahamat seeks any and all equitable relief, together with any and all remedies, that the Court deems just and appropriate, including ordering the University to return her to the graduate program and removing any and all disciplinary remarks from her file, pertaining to the alleged conduct.

## <u>DEMAND FOR A JURY TRIAL</u>

In accordance with federal law, Ms. Shahamat hereby demands a trial by jury on all appropriate issues.

Respectfully submitted,

**MONTGOMERY LAW, PLLC**
1420 Locust Street, Suite 420
Philadelphia, PA 19102
***Attorneys for Plaintiffs***

Dated: December 23, 2022          By: _____

Bradley R. Flynn
NJ Bar ID No. 173362016